RICK EICHSTAEDT (OSB # 97255)
Rey-Bear McLaughlin, LLP
421 W Riverside Avenue, Suite 1004
Spokane, Washington 99201
Telephone: 509.251.1424
rick@rbmindianlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| CONFEDERATED TRIBES OF COOS, LOWER UMPQUA AND SIUSLAW INDIANS, | Case No.: |
| *Plaintiff,* | **COMPLAINT** |
| v. | |
| BUREAU OF OCEAN ENERGY MANAGEMENT, | |
| *Defendant.* | |

## INTRODUCTION

1.      The Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians ("Tribe" or "CTCLUSI") brings this case challenging Defendant Bureau of Ocean Energy Management's ("BOEM" or "Defendant") environmental analysis and decision to proceed with the sale of leases and associated site characterization and site assessment activities for the private development of massive offshore wind energy facilities along two portions of the Oregon Coast near Coos Bay, Oregon and Brookings, Oregon.

2.      Specifically, the Tribe brings this action for declaratory and injunctive relief against the BOEM for issuing its August 2024 Final Environmental Assessment ("EA"), the

Finding of No Significant Impact ("FONSI")[1], and the September 3, 2024 Final Sale Notice

("FSN")[2] for the Commercial Wind Lease Issuance on the Pacific Outer Continental Shelf,

Offshore Oregon that violates 5 U.S.C. § 701 *et seq.* of the Administrative Procedure Act

("APA"), the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the NEPA

implementing regulations developed by the Council on Environmental Quality ("CEQ"), 40

C.F.R. §§ 1500-1508, the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101 *et

seq.*, and the NHPA implementing regulations developed by the Advisory Council on Historic

Preservation ("ACHP"), 36 C.F.R. Part 800.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 1361 (action to compel an officer of the United States to perform her/his

duty), and 28 U.S.C. §§ 2201-2202 ("creation of remedy" and "further relief" provisions

establishing power to issue declaratory judgments in case of actual controversy). The Tribe has a

right to bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§

701-706.

4.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because the

Tribe resides in this district, a substantial part of the events or omissions giving rise to the claims

herein occurred within this judicial district, and affected waters and resources in question are

located in this district.

---

[1] The EA and FONSI are available at https://www.boem.gov/renewable-energy/state-
activities/commercial-wind-lease-issuance-pacific-outer-continental-shelf-0.
[2] Published in the Federal Register at 89 Fed. Reg. 71398 (Sep. 3, 2024).

## THE PARTIES

5.      Plaintiff   CONFEDERATED  TRIBES  OF  COOS,  LOWER  UMPQUA  AND
SIUSLAW  INDIANS  is  a  federally  recognized,  sovereign  Indian  Nation  with  authority  and
jurisdiction over its citizens, its territory, and resources located along the Oregon Coast.

6.      The Tribe is made up of three tribes (four bands): two bands of Coos Tribes:
Hanis Coos (Coos Proper), Miluk Coos; Lower Umpqua Tribe; and Siuslaw Tribe.

7.      Since time immemorial, the Tribe and its members have resided on the Oregon
Coast and relied upon its abundant resources.



8.      As depicted above, the Tribe's ancestral homeland encompasses approximately
1.6 million acres of resource-rich lands lying along a 75-mile-long section of the Oregon coast

and extending inland across the Coast Range to Oregon's interior valleys. The Tribe's ancestors were the stewards and caretakers of all these lands since time immemorial.

9.      Tribal oral histories attribute the Ocean with the creation of the World and of Tribal people.

10.      The Ocean and much of the associated shoreline areas are of traditional religious and cultural importance to Tribe.  The Tribe's religious beliefs, traditional practices, fishing, first foods and relations are interconnected and influenced by all that is encompassed in the broader Ocean.

11.      The Tribe and its members retain the right and continue to practice their culture, religion, and traditional lifeways within their ancestral Territory, including the Ocean.  Tribal members value and attribute significant cultural and religious significance to the Ocean and its untouched Ocean viewscapes (the view or prospect from a particular place).

12.      Tribal traditions include a respect and reverence for natural law and create a powerful voice for responsible environmental stewardship.  This is well illustrated by the Tribe's Natural Resource and Culture Department, which is committed to the preservation, protection, enhancement, and management of the Tribe's natural resources, as well as being dedicated to restoring the environment within traditional cultural and historical boundaries of the Tribe to improve the quality of life and provide direct social and economic benefit for the Tribe and its people. The Tribe remains an important part of the surrounding community and seeks to protect the abundance of traditional and cultural resources within the Ocean and associated shoreline areas.

13.      The Tribe has two casinos in Coos Bay and Florence, Oregon that provide valuable jobs to Tribal members and local citizens and generate income for the Tribal

Government, which is used to provide services to Tribal members and fund a variety of programs, including environmental and cultural resource programs.

14.     Visitors to the casinos are drawn to the area by the untouched and natural beauty of the Pacific Ocean, its beaches, and its viewsheds.

15.     The Tribe and its members' use of the Ocean and its resources would be directly impacted by BOEM's actions.

16.     The Tribe would suffer economic harm from BOEM's actions.

17.     Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is a federal agency within the Department of Interior.  BOEM governs the leasing and management of offshore renewable energy projects. *See* 30 C.F.R. § 585.200-234.  BOEM issued the EA, FONSI, and FSN at issue in this matter.

<strong><u>STATUTORY AND REGULATORY FRAMEWORK</u></strong>

A.     <u>**National Environmental Policy Act**</u>

18.     NEPA "is our basic national charter for protection of the environment." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (*quoting Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)). The statute "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). An agency's obligation, under NEPA, to obtain and disclose environmental information during the public review process is central to NEPA's core principle of "democratic decisionmaking." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 n.24, 1122 (9th Cir. 2010).

19.     NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment."   NEPA is intended to reduce or eliminate

environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. § 4321.

20.     NEPA's purpose is twofold: first, to ensure that federal agencies undertaking a major federal action take a "hard look" at a proposed project's environmental impacts before deciding how to proceed, and second, to ensure that relevant information about the impacts of a proposed project and its alternatives is made available to members of the public, in order to provide a meaningful opportunity for their comment and participation in the federal decision-making process.

21.     Federal agencies fulfill their NEPA obligations in one of three ways: by preparing an environmental impact statement, by preparing an environmental assessment and Finding of No Significant Impact, or by determining the project is subject to a categorical exclusion.

22.     NEPA requires that federal agencies must take a "hard look" at identifying and evaluating potential adverse environmental impacts.  *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998).  Courts will set aside a NEPA document as arbitrary or capricious if the agency can identify no "rational connection between the facts found and the choice made;" that is, if the "explanation for its decision [ran] counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

23.     The CEQ has promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. § 1500 *et seq.* An agency's NEPA procedures must be consistent with the CEQ regulations.

24.     Essential to an agency's obligations under NEPA is the duty to ensure that "high quality" information is available to the public before decisions are made and before actions are taken. 40 C.F.R. §1500.1(b).

25.     CEQ regulations define the "[e]ffects or impacts" that agencies must consider in the NEPA process to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, such as disproportionate and adverse effects on communities with environmental justice concerns, whether direct, indirect, or cumulative. Effects also include effects on Tribal resources and climate change-related effects, including the contribution of a proposed action and its alternatives to climate change, and the reasonably foreseeable effects of climate change on the proposed action and its alternatives. Effects may also include those resulting from actions which may have both beneficial and adverse effects, even if on balance the agency believes that the effects will be beneficial" 40 C.F.R. § 1508.1(i)(4).

26.     NEPA requires agencies to analyze cumulative effects, which are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.1(i)(3).

27.     NEPA regulations require that an agency "integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that agencies consider environmental effects in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. §1501.2(a).

28.      CEQ regulations provide that agencies should prepare an EA for proposed actions that are not categorically excluded if those actions are "not likely to have significant effects or when the significance of the effects is unknown[.]" 40 C.F.R. § 1501.5(a). The EA may assist the agency in determining whether to prepare a full-fledged EIS or whether to issue a finding of no significant impact. 40 C.F.R. § 1501.5(c)(1).

29.      If the federal action may significantly affect the environment, the agency must prepare an Environmental Impact Statement ("EIS"). *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998). Whether an action is significant requires consideration of the "context" and "intensity" factors. 40 C.F.R. § 1501.3(d); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).  For context, an agency must "consider the characteristics of the geographic area, such as proximity to unique or sensitive resources or communities with environmental justice concerns. Depending on the scope of the action, agencies should consider the potential global, national, regional, and local contexts as well as the duration, including short-and long-term effects."  40 C.F.R. § 1501.3(d)(1).  For intensity, the agency must consider a number of factors, including the unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the potential effects on the human environment are highly uncertain; and the degree to which the action may adversely affect communities with environmental justice concerns.  *Id.*

30.      "NEPA requires that an environmental analysis for a single project consider the cumulative impacts of that project together with all past, present and reasonably foreseeable future actions." *See Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). *See also Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("In a

cumulative impact analysis, an agency must take a 'hard look' at all actions that may combine with the action under consideration to affect the environment.") (*quoting Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)) (cleaned up).

31.    NEPA Section 102(2)(E) requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(H). Section 102(2)(H) applies to both EAs and EISs, so an EA must include "appropriate alternatives" when a proposal involves unresolved conflicts concerning alternatives uses of available resources. EAs must also include a "no action" alternative in addition to the preferred alternative, as well as a range of appropriate alternatives. 40 C.F.R. § 1501.5(c)(2)(ii) (citing Section 102(2)(H)).

**B.    National Historic Preservation Act**

32.    The NHPA requires federal agencies to "take into account the effect of the undertaking on any historic property."  54 U.S.C. § 306108; *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 581 (9th Cir.1998).  Similar to NEPA, the NHPA "is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs."  *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 805 (9th Cir. 1999); *see also Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988); *United States v. 0.95 Acres of Land,* 994 F.2d 696, 698 (9th Cir. 1993) (Section 106 is "similar to NEPA except that it requires consideration of historic sites, rather than the environment.").

33.    An agency must initiate the 106 process early in the planning processes.  36 C.F.R. § 800.1(c).  Except for certain nondestructive project planning activities, the 106 process must be completed prior to the issuance of a decision.  *Id.*  Guidance emphasizes that "Section

106 review should be complete prior to issuance of a federal decision, so that a broad range of alternatives may be considered during the planning process."[3]

34.    Courts, likewise, have consistently held that the NHPA "does not itself require a particular outcome, but rather ensures that the relevant federal agency will, before approving funds or granting a lease to the undertaking at issue, consider the potential impact of that undertaking on surrounding historic places." *Business and Residents of Alliance of East Harlem v. HUD*, 430 F.3d 584, 591 (2d Cir. 2005) (citations omitted); *see also Montana Wilderness Ass'n v. Fry*, 310 F.Supp.2d 1127, 1153 (D. Mont. 2004) (agency violated the NHPA by failing to complete process prior to selling leases); *Pit River Tribe v. U.S. Forest Service,* 469 F.3d 768, 774-75 (9th Cir. 2006) (agencies must consider impacts to historic sites before extending leases, later review under the NHPA cannot cure the earlier violation).

## C.    <u>Administrative Procedure Act</u>

35.    The APA, 5 U.S.C §§701-706, provides for judicial review of federal agency determinations such as those at issue here. The APA requires a reviewing court to hold unlawful and set aside any agency action found to be arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C § 706(2)(A).

## D.    <u>Declaratory Judgment Act</u>

36.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, authorizes "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration.

---

[3] Advisory Council on Historic Preservation, *Integrating NEPA and Section 106*, *available at* https://www.achp.gov/ integrating_nepa_106.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. <u>The Oregon Coast and Significance to the Tribe</u>**

37.    As stated above, the land and waters of the Oregon coast have been used and occupied by the Tribe and its members since time immemorial. Prior to European contact, the Tribe and its members relied predominantly on fishing, hunting, gathering, and trading for sustenance.

38.    Their natural resource utilization occurred in a wide variety of environments, including sand spits, saltwater bays, open ocean areas, tidal and intertidal estuaries, lake shorelines, river mouths, and their ocean confluences.

39.    The diets of the Tribal members primarily consisted of salmon, shellfish, plants, and land mammals. The Tribe was (and continued to be) renowned for their maritime lifestyles, elaborate technology, high population densities, sophisticated art and architectural traditions, and sociopolitical complexity.

40.    Archeological evidence of subsistence activities can be found along the Oregon coastline in the form of shell middens, fishing weirs, food processing sites, villages, and seasonal occupation camps.

41.    Following the peak of the last ice age about 21,000 years ago, the large continental ice sheets began to retreat, causing sea levels to rise by an average of about 430 feet. When the ice was prominent and sea levels were lower, large expanses of the continental shelf that today are submerged were then exposed.  These exposed areas were utilized by the Tribe and its members.

42.    As the melting progressed and sea levels rose, archaeological sites along the coast were submerged and continue to exist today under the surface of the water.

COMPLAINT - 11

43.     The lifestyle and culture of the Tribe is tied to Oregon's rich coastal and marine waters, which support countless species of seabirds, marine mammals, fisheries, aquatic plants, and dramatic landscapes. It is also home to underwater kelp forests, tide pools, and rocky reefs that offer important habitat for thousands of fish, marine mammals, and invertebrate species.

44.     Oregon's coastal and ocean ecosystems are facing increasing threats, including ocean warming, acidification, overfishing, pollution and development.  Increasing human uses of the Ocean and coasts have lead to steep declines in fish and wildlife populations and habitat loss that threatens the long-term sustainability of biological resources.

45.     The Oregon Coast contains the Cascadia Subduction Zone, which is a 700-mile fault that runs from northern California up to British Columbia and is about 70-100 miles off the shoreline. There have been 43 earthquakes in the last 10,000 years within this fault. Oregon has the potential for a 9.0+ magnitude earthquake caused by the Cascadia Subduction Zone and a resulting tsunami of up to 100 feet in height that will impact the coastal area.

46.     The South Oregon Coast region, which includes the Tribe's ancestral territory and areas that will be impacted by BOEM's proposed offshore wind development, extends from Florence, Oregon to the California border.  This area is distinct from the North and Central Coast regions because of its mountainous nature, due to tectonic uplift and terrane accretion in ancient times. Much of the coastline in this region is made up of sea cliffs and miles of beaches.

47.     The area today is home to a thriving tourism economy and commercial fishing industry. Every year, thousands of tourists come to the area and spend millions of dollars to hike on its beaches, observe whales and other marine mammals, enjoy the views of the ocean, stay in historic properties, frequent the Tribe's businesses, and experience the untouched views of the Ocean viewscape.

48.     The Tribe's two casinos benefit from tourists that are drawn to the area and revenue from these facilities is used to support all aspects of the Tribal government and services to its members, including Tribal social service and environmental restoration programs.

49.     With an economy based largely on tourism, natural resource restoration and management, and commercial fishing, the area cannot sustain a drastic change in its workforce and culture, which will occur because of offshore wind projects. Small family businesses will face hardship and may be forced to close, which will eliminate services tourists rely on. Commercial fisheries will face increased safety hazards, lower yields, and will most likely be unable to fish productively in the Project area. With a loss in tourism, business at the Tribe's casinos will decline in value and demand, and the spirit, culture, and rich history of the Oregon Coast will be significantly impacted.

50.     In addition, the loss of species and impacts to Ocean viewshed will irreversibly impact Tribal cultural, religion, and spirituality.

**B.      Federal Offshore Wind Program**

51.     In 1953, Congress enacted the Outer Continental Shelf Lands Act ("OCSLA"), authorizing the Secretary of the Interior to oversee mineral exploration and development on the Outer Continental Shelf by granting oil and gas leases through a competitive bid process managed by the Department of Interior.  43 U.S.C. §§ 1331-1356.

52.     Originally, the Act "establishe[d] a procedural framework under which Interior may lease areas of the [Outer Continental Shelf] for purposes of exploring and developing the oil and gas deposits of the [Outer Continental Shelf ]'s submerged lands." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).

53.     In 2005, Congress amended OCSLA, placing regulatory authority of renewable energy projects in the Minerals Management Service, an agency within the Department of Interior, and authorizing the Minerals Management Service to grant leases for offshore renewable energy projects.  43 U.S.C. § 1337(p)(1)(C).

54.     In the 2005 amendment, Congress declared the policy underlying the Act:

It is hereby declared to be the policy of the United States that . . . this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected; . . . the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs; . . . since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments. . . .

43 U.S.C. § 1332.

55.     On October 1, 2011, the Department of Interior created BOEM to take the place of the Minerals Management Service and transferred all regulatory authority of the Minerals Management Service to BOEM. BOEM became "responsible for managing development of the nation's offshore resources in an environmentally and economically responsible way."[4]  BOEM also became responsible for leasing, plan administration, environmental studies, NEPA analysis, resource evaluation, economic analysis, and the renewable energy program.

56.     In March 2021, the Biden Administration established a policy of producing thirty (30) Gigawatts of offshore wind power by 2030:

To position the domestic offshore wind industry to meet the 2030 target, DOI's

---

[4]  Bureau of Ocean Energy Management, Reorganization of the Former MMS, https://www.boem.gov/about-boem/reorganization/reorganization-former-mms.

Bureau of Ocean Energy Management . . . plans to advance new lease sales and complete review of at least 16 Construction and Operations Plans (COPs) by 2025, representing more than 19 GW of new clean energy for our nation. . . . Achieving this target also will unlock a pathway to 110 GW by 2050. . . . [5]

57.     BOEM has demonstrated a biased and prejudged political decision to develop offshore wind energy, notwithstanding existing laws and regulations requiring due process and careful consideration of its harmful impacts. For example, in 2022, BOEM and NOAA entered into a memorandum of agreement to "support[] the goal…to responsibly deploy 30 gigawatts of energy production on the Outer Continental Shelf by 2023…."[6]  The memorandum proclaims the intent of BOEM and NOAA to "proactively refine administrative procedures" without mention of existing environmental review obligations.[7]

58.     On September 5, 2024, the Interior Department announced that it had approve a tenth offshore wind project acknowledging "the Biden-Harris administration's commitment to expedite the federal permitting process."[8]

59.     In March 2023, the Administration announced its intent to develop "Wind Energy Areas off Every Coast" and to hold "up to seven offshore wind lease sales by 2025," which would include "offshore Oregon."[9]

---

[5] Biden Administration, Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs (March 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[6] Memorandum of Understanding Between NOAA, NMFS, BOEM and RODA (March 25, 2019), https://www.boem.gov/sites/default/files/documents//NOAA-BOEM-MOU.pdf).

[7] *Id.* at 1.

[8] Department of Interior, Biden-Harris Administration Marks Major Milestones for Offshore Wind, Approves Tenth Project (September 5, 2025), https://www.doi.gov/pressreleases/biden-harris-administration-marks-major-milestones-offshore-wind-approves-tenth. (Emphasis added).

[9] Biden Administration, FACT SHEET: Biden-Harris Administration Continues to Advance American Offshore Wind Opportunities (March 29, 2024),

60.     In a meeting that occurred with representatives of West Coast Tribes on June 6, 2024, BOEM Director Elizabeth Klein admitted that she had specific political direction from the White House to complete offshore wind projects, stating, "The President has made clear the climate crisis is real, the government has a responsibility to address it and has set goals to address a clean energy transition. My job is to implement the President's direction."  This message was repeated by Director Klein during a meeting with the Tribe on July 31, 2024.

61.     Important questions regarding potential impacts of offshore wind remain unresolved, including potential impacts to tribal rights, the marine ecosystem, commercial and recreational fishing, coastal communities, utility power costs, and more. In previous BOEM activities exploring offshore wind leasing areas along the U.S. coastline, Tribes and stakeholders have raised concerns regarding the transparency and inclusivity of BOEM's typical planning process for offshore wind.  These questions remain unanswered.

## C.     Oregon Offshore Wind Development

62.     BOEM has proposed private offshore wind energy development on approximately 194,995 acres offshore southern Oregon with their closest points to shore ranging from approximately 18–32 miles in and water depths of 1,860–5,023 feet.  EA at 5.  The two areas for development are referred to as the Coos Bay Wind Energy Area ("WEA") and the Brookings WEA and are depicted below.  The Coos Bay WEA is 61,204 acres and the Brookings WEA is 133,808 acres.

---

https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/29/fact-sheet-biden-harris-administration-continues-to-advance-american-offshore-wind-opportunities/.



63.    The massive private development, as depicted below, could generate more than

3.1 gigawatts of power.

**Table 1-1: Descriptive Statistics for the Recommended Oregon Wind Energy Areas**

| WEA | Acres | Installation Capacity (MW)[1] | Homes Powered (MW)[2] | Power Production (MWh/yr): 40% Capacity Factor[3] | Power Production (MWh/yr): 60% Capacity Factor[4] | Maximum Depth (meters) | Minimum Depth (meters) |
|------|--------|------|------|------|------|------|------|
| Coos Bay | 61,203 | 991 | 346,752 | 3,471,482 | 5,207,224 | 1,414 | 635 |
| Brookings | 133,792 | 1,166 | 758,012 | 7,588,788 | 11,383,182 | 1,531 | 567 |
| Total (or max, min) | 194,995 | 3,156 | 104,764 | 1,060,270 | 16,590,406 | 1,531 | 567 |

Key:
1.  Megawatts (MW) based upon 4 MW/km² (Musial et al. 2023)
2.  Number of homes powered, based upon 350 homes per MW
3.  The 40% capacity factor is calculated as follows: Capacity (MW) × 8,760 (hrs/yr) × 0.4 (capacity factor)
4.  The 60% capacity factor is calculated as follows: Capacity (MW) × 8,760 (hrs/yr) × 0.6 (capacity factor)

EA at 7.

64.     The technology for this proposed offshore wind technology for deep water is still in the development stages. Due to the significant depth of the ocean floor off the coast of Oregon, it is not feasible to use proven fixed-bottom offshore wind platform technologies at most sites.

65.     Little information exists about the impacts of floating offshore wind energy development on fish habitat, marine mammals, cultural resources, and the Ocean ecosystem in the Pacific Ocean.

66.     No current floating offshore wind energy facilities have been constructed or operated on the Pacific coast of the United States.

67.     BOEM's WEAs are in areas that contain important fish habitat, marine mammal migration routes, and contain viewsheds that are culturally significant to the Tribe.

68.     BOEM is specifically proposing the development of floating wind farms (depicted below), which are made up of wind turbines that are placed on floating structures and stabilized by moorings and anchors, and by the way the design of the structure distributes the masses and weights.  Fixed or floating, a typical commercial-scale offshore wind farm consists of an inter-array cable connecting the turbines to an offshore substation and an export cable connecting the

offshore substation to shore.  Electrical cabling is used to transmit the generated power from the turbines to an offshore or onshore substation, ensuring continuous energy transfer.



69.     On the continental shelf, in-water trenching technologies can be used to bury the cables for protection. However, it is an inappropriate method for installation in hard or rocky bottoms. In these areas, cables may be laid on exposed seafloor and subsequently covered or armored with some form of protection or brought to shore using horizontal directional drilling.

70.     BOEM initiated its offshore wind development process in Oregon in 2022, when it initiated a Call for Information and Nominations for two areas in Southern Oregon: Coos Bay and Brookings.  BOEM received 281 comments from Tribal nations, the general public, Federal, State, and local agencies, the fishing industry, industry groups, developers, non-governmental organizations, universities, and other stakeholders   89 Fed. Reg. 71398 (Sep. 3, 2024).

71.     On August 15, 2023, BOEM announced a public comment period on the two draft WEAs located offshore southern Oregon.

72.     On May 1, 2024, BOEM initiated a 30-day public comment period, with a subsequent 2-week extension, on the draft EA.  EA at 7.  BOEM received a total of 350 public comments on the draft EA.  EA at B-5.

73.     On August 13, 2024, BOEM released the final EA and FONSI.

74.     On August 29, 2024, the BOEM announced the FSN for offshore wind leasing setting the auction date for October 15, 2024 in the two lease areas offshore Oregon and qualifying five companies to participate in the sale. The FSN also contains information about the lease areas, certain lease provisions and conditions, auction details, the lease form, criteria for evaluating competing bids and procedures for lease award, appeals and lease execution. 89 Fed. Reg. 71398 (Sep. 3, 2024).

75.     BOEM has acknowledged that the EA, FONSI, and FSN were issued without finalization of the NHPA Programmatic Agreement – "BOEM is consulting on a draft Programmatic Agreement (PA) pursuant to 36 CFR § 800.14(b) to fulfill its obligations under Section 106 of the NHPA for renewable energy activities on the OCS offshore Oregon. The PA is still under consultation and BOEM returned the latest revised draft to the consulting parties for their review on June 27, 2024."  EA at 95.

76.     The scope of BOEM's EA was limited to analyzing the impacts of the issuance of leases and site characterization and site assessment activities and did not analyze the impacts of any future construction and/or operation of wind energy facilities.  EA at 5, 9.

77.     BOEM received numerous comments, including comments from the Tribe, requesting the scope of its analysis be expanded to consider ecological, cultural, seismic, and other impacts associated with construction and operation of the wind energy facilities, including impacts associated with cables that will extend to and through near shore and shoreline areas.

78.    The Tribe and others also commented that this analysis should occur in a comprehensive Environmental Impact Statement.

79.    BOEM rejected this request narrowly defining the scope of its EA to " "analyze whether the issuance of leases and grants within the wind energy areas (WEAs) offshore Oregon … would result in significant impacts on the environment."  EA at 5 ("[E]nvironmental analysis focuses on the effects of site characterization and site assessment activities expected to occur after the issuance of commercial wind energy leases."  *Id.).*

80.    BOEM summarily dismissed consideration of the inevitable result of its action – construction and operation – by stating, "An EA was selected for the Oregon leasing action and is consistent with BOEM's prior leasing actions offshore other states, because EAs are typically conducted when a proposed action is expected to have less than significant environmental impact."  EA at B-19.

81.    The only "foreseeable" action identified by BOEM in the EA is "lease issuance to be followed by site characterization and assessment activities on the OCS and state waters."  EA at 10.

82.    The Tribe and others commented that BOEM should analyze the cumulative effects of all Pacific Coast offshore wind development, which include all sites identified as potential lease areas.

83.    BOEM rejected this request stating that a cumulative assessment would be discussed and considered at some future date – "BOEM initiated a programmatic EIS of the five wind leases offshore California in December 2024 and recommends that this process be considered if Oregon leases are issued and as a topic for further coordination and discussion."  EA at B-20

84.     The Tribe and others requested that BOEM consider additional alternatives in its EA.  In its March 15, 2024 scoping comments, the Tribe requested that BOEM consider alternatives that exclude entire or substantial portions of the Coos Bay WEA to address adverse impacts to sensitive ocean ecosystems and traditional cultural areas, features, or resources, via avoidance and mitigation. The Environmental Protection Agency recommended in Scoping comments that the draft EA include a Fisheries Habitat Impact Minimization alternative to determine whether portions of the potential lease area should be avoided due to impacts to bottom habitat.  The Oregon Department of Fish and Wildlife recommended that BOEM consider an alternative that excludes areas that contain sensitive and important habitats.  The National Oceanic and Atmospheric Administration requested the development of an alternative that would exclude "sensitive and irreplaceable living (and non-living) habitat features."  The Pacific Fishery Management Council requested that "areas of importance to habitats, fishing, and the broader ecosystem" be excluded from the future lease areas.

85.     BOEM rejected these requests of the EA only contained BOEM's preferred alternative and a no-action alternative.

86.     The EA failed to contain a substantive discussion of why other alternatives were dismissed from consideration, simply stating, "Because the Proposed Action would not result in the approval of a wind energy facility and is expected to result only in site assessment and site characterization activities, BOEM has not identified any additional action alternatives that could entail meaningful differences in impacts on resources analyzed. in this EA."  EA at 8-9.

87.     BOEM also failed to consider impacts associated with the actions specifically authorized by the EA, FONSI, and FSN.  For example, the EA fails to fully consider the impacts of site characterization for the siting of subsea cable corridors.

88.     The EA states, "Under the Proposed Action, BOEM would potentially issue leases that could cover the entirety of the WEAs, issue easements associated with each lease, and issue grants for subsea cable corridors and associated offshore collector/converter platforms. The potential ROWs, RUEs, and easements would all be within the Oregon OCS and could include corridors extending from the OCS through state waters to the onshore energy grid." EA at 7.

88.     The EA estimates that areas of disturbance from bottom sampling could occur along potential offshore export cable corridors and acknowledges the potential impacts from site assessment of subsea cable corridors.  However, there is no further discussion of how those impacts are insignificant.

89.     BOEM further to properly assess other impacts associated with the site assessment and characterization activities including impacts associated with sonar use to marine mammals.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NEPA and APA Violations:
### Unlawfully Narrow Purpose and Need and Unreasonable Range of Alternative

90.     Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

91.     This First Claim for Relief challenges BOEM's violations of NEPA and implementing regulations in approving the EA, FONSI, and FSN based on an unreasonably

narrow purpose and need statement and range of alternatives.  Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

92.    BOEM violated NEPA because the EA failed to analyze reasonable alternatives to the proposed action, including alternatives identified by the Tribe, other agencies, and the public that would have reduced environmental impacts. Instead, the EA simply analyzed two alternatives without providing any meaningful rationale for excluding other alternative from consideration.

93.    BOEM selected an unreasonable range of alternatives, in part, due to the EA's impermissibly narrow purpose and need and determination to analyze only two alternatives that lacked adequate explanation or justification. This is contrary to NEPA and its implementing regulations.

94.    Accordingly, the EA, FONSI, and FSN are arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiff and its members and must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

**SECOND CLAIM FOR RELIEF**
**NEPA and APA Violations:**
**Failure to Take a "Hard Look"**

95.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

96.    This Second Claim for Relief challenges BOEM's violations of NEPA and implementing regulations in approving the FONSI and FSN based on the failure of the EA to take a "hard look" at potential impacts as required by NEPA. Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

97.    The EA, FONSI, and FSN are based upon unsupported assumptions, errors, and

omissions; inaccurate and incomplete analysis; and an inaccurate and incomplete baseline of environmental conditions and resources. As a result of these and other issues, the EA did not fully and appropriately assess and disclose the impacts of the alternatives; did not analyze direct, indirect, and cumulative impacts of the alternatives, including past, present, and reasonably foreseeable future actions; and did not rely on high-quality information.

98.     The EA, FONSI, and FSN failed to take a hard look at the impacts to the environment from private offshore wind energy development, including impacts from construction and operation of wind energy facilities, impacts associated with cables and transmission infrastructure, aquatic resources, seismic effects, environmental justice, cultural resources, natural viewscapes, and cumulative effects.

99.     By segmenting their offshore wind program and analyzing the environmental impacts of the project in isolation, BOEM  unlawfully fail to analyze and consider the cumulative environmental impacts of the other multiple offshore wind projects that BOEM has approved or is considering for approval.

100.    BOEM also failed to take a "hard look" at impacts associated with the site characterization and assessment work authorized by its actions.

101.    Accordingly, the EA, FONSI, and FSN are arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiff and its members and must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF
### NEPA and APA Violations:
### Biased and Prejudged Political Determination

102.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

103.    This Third Claim for Relief challenges BOEM's violations of NEPA and implementing regulations in approving the EA, FONSI, and FSN because BOEM made a biased and prejudged political decision to adopted its preferred alternative. Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

104.    The EA, FONSI, and FSN are based upon a predetermined political decision.

105.    Because of the biased and prejudged political decision, BOEM did not seriously consider public comments and performed mere *pro forma* compliance with NEPA.

106.    The biased and prejudged political decision failed to conduct a NEPA analysis with good faith objectivity, committed BOEM to a certain outcome before the conclusion of the NEPA process, and/or amounted to an irreversible and irretrievable commitment by BOEM to its preferred alternative.

107.    Accordingly, the EA, FONSI, and FSN are arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiff and its members and must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

### FOURTH CLAIM FOR RELIEF
### NEPA and APA Violations:
### Failure to Complete an Environmental Impact Statement

108.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

109.    This Fourth Claim for Relief challenges BOEM's violations of NEPA and

implementing regulations in failing to complete an Environmental Impact Statement as required by NEPA. Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

110.    Determining the significance of an action in an EA or elsewhere requires the agency to consider the "context" and "intensity" of the impact by evaluating factors enumerated at 40 C.F.R. § 1501.3, including the unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the potential effects on the human environment are highly uncertain; and the degree to which the action may adversely affect communities with environmental justice concerns.

111.    BOEM's decision to proceed with the FSN implicates unique ocean ecosystems and cultural resources, involves unknown and uncertain risk, and impacts the interests of the Tribe (a community with environmental justice concerns).  Moreover, by failing to consider other known actions cumulatively and by failing to consider reasonably foreseeable future actions, BOEM failed to properly access to degree of impact associated with its actions.

112.    BOEM was required to prepare an EIS before proceeding with issuing the FSN.

113.    By issuing an inadequate EA and FONSI instead of preparing an EIS, BOEM acted in an arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiff and its members, and its decision must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

**FIFTH CLAIM FOR RELIEF**
**NHPA and APA Violations:**
**Failure to Finalize Programmatic Agreement**

114.    Plaintiff realleges and incorporates by reference all preceding paragraphs

115.    This NHPA Claim for Relief challenges BOEM's violations of NHPA and implementing regulations in failing to comply with the requirements of the NHPA prior to the issuance of the EA, FONSI, and FSN. Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

116.    The NHPA requires the completion of the substantive and procedural requirements of the NHPA prior to the issuance of an agency decision.

117.    BOEM has acknowledged that it did not finalize the Programmatic Agreement for its project prior to the issuance of the EA, FONSI, and FSN.

118.    By issuing the EA, FONSI, and FSN without the finalization of the Programmatic Agreement, BOEM acted in an arbitrary, capricious, an abuse of discretion, not in accordance with law under NHPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiff and its members, and its decision must be set aside and vacated pursuant to the APA, 5 U.S.C. § 706.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Tribe respectfully requests the following relief:

1.    Adjudge and declare that the EA, FONSI, and FSN violate NEPA, NHPA, and the APA under any or all of the Claims for Relief above;

3.    Vacate, reverse, set aside, and/or rescind the EA, FONSI, and FSN violate NEPA, NHPA, and the APA;

COMPLAINT - 28

4.      Award the Tribe its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

5.      Grant the Tribe such additional or different relief as it deems just and proper.

Dated the 13th day of September 2024.

*s/Rick Eichstaedt*
RICK EICHSTAEDT (OSB # 97255)

Rey-Bear McLaughlin, LLP
421 W Riverside Avenue, Suite 1004
Spokane, Washington 99201
Telephone: 509.251.1424
rick@rbmindianlaw.com

Attorney for the Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians